UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

ANDREW J. CAPUL, DAVID COLON, ERIC R.        Civil Action No.:
RODRIGUEZ, and PETER A. DeBLASIO,

                Plaintiffs,

                                    **COMPLAINT**

     -against-

THE CITY OF NEW YORK, and WILLIAM J. BRATTON and
LAWRENCE BYRNE, in their individual and official
capacities,                           **JURY TRIAL REQUESTED**

                Defendants.
-------------------------------------------------------------------------X

     Plaintiffs, ANDREW J. CAPUL, DAVID COLON, ERIC R. RODRIGUEZ, and PETER

A. DeBLASIO (collectively "Plaintiffs"), by and through their attorneys, LAW OFFICES OF

YALE POLLACK, P.C. and FAMIGHETTI & WEINICK, PLLC, allege upon knowledge as to

themselves and their own actions, and upon information and belief as to all other matters, as

follows:

## JURISDICTION AND VENUE

    1.    This is a civil action based on Defendants' violations of Plaintiffs' rights as

guaranteed to them by the Fourteenth Amendment to the United States Constitution, as enforced

by 42 U.S.C. §1983 ("Section 1983").

    2.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343.

    3.    Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events

or omissions giving rise to this action alleged herein, occurred in this district.

## PARTIES

    4.    Plaintiff, Andrew J. Capul ("Capul"), is a resident of the State of New York, County

of Rockland.

5.      Plaintiff, Eric R. Rodriguez ("Rodriguez"), is a resident of the State of New York, County of Staten Island.

6.      Plaintiff, David Colon ("Colon"), is a resident of the State of New York, County of Orange.

7.      Plaintiff, Peter A. DeBlasio ("DeBlasio"), is a resident of the State of New York, County of Queens.

8.      Defendant, the City of New York (the "City"), was and still is a municipality organized under the laws of the State of New York and is a public employer with a principal place of business in the County of New York. The City operates, as one of its many agencies, the New York City Police Department ("NYPD").

9.      Defendant, William J. Bratton ("Bratton" or the "Commissioner"), was at all relevant times, Commissioner of the NYPD, working in the County of New York.   As commissioner, Bratton was vested by State and City law to have final policymaking decisions with respect to matters concerning the NYPD, and Bratton regularly exercised such final policymaking authority.   In fact, as described herein, Bratton directed, approved of, and/or acquiesced in the decisions and acts which caused the Constitutional deprivations at issue here.

10.      Defendant, Lawrence Byrne ("Byrne"), was, at all relevant times Deputy Commissioner of Legal Matters of the NYPD and acted under color of state law with respect to the allegations herein.   Byrne was a high-ranking official of the NYPD and had final authority over significant NYPD matters, including the employment matters at issue here.   Byrne reported directly to the Commissioner.

## FACTS

**Andrew J. Capul**

11.     On July 16, 1984, the NYPD hired Capul.

12.     For decades, Capul performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and receipt of consistent performance evaluations rating him above or well above standards, and awards, honors, and recognitions, too numerous to list here.

13.     In June 2015, the NYPD again promoted Capul via a discretionary promotion, to the rank of Deputy Chief.

14.     At the time of the relevant events described herein, Capul held the position of Deputy Chief, assigned to Patrol Borough Manhattan North, one of the most highly respected and coveted assignments in the NYPD, showing the NYPD's overwhelming trust in Capul.

15.     At all relevant times, Capul was a member in good standing of the NYPD.

**Eric R. Rodriguez**

16.     In June 1992, the NYPD hired Rodriguez.

17.     During his tenure with the NYPD, Rodriguez performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and receipt of consistent performance evaluations rating him above or well above standards, and awards, honors, and recognitions, too numerous to list here.

18.     In November 2014, the NYPD again promoted Rodriguez via a discretionary promotion, to the rank of Deputy Chief.

19.     At the time of the relevant events described herein, Rodriguez held the position of

Deputy Chief, assigned to Patrol Borough Brooklyn South, one of the most highly respected and coveted assignments in the NYPD, showing the NYPD's overwhelming trust in Rodriguez.

20.     At all relevant times, Rodriguez was a member in good standing of the NYPD.

**David Colon**

21.     In July 1986, the NYPD hired Colon.

22.     For decades, Colon performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector, and receipt of consistent performance evaluations rating him above or well above standards, and awards, honors, and recognitions, too numerous to list here.

23.     In July 2013, the NYPD again promoted Colon via a discretionary promotion, to the rank of Deputy Chief.

24.     At the time of the relevant events described herein, Colon held the position of Deputy Chief, assigned to the NYPD's Housing Bureau.

25.     At all relevant times, Colon was a member in good standing of the NYPD.

**Peter A. DeBlasio**

26.     On January 4, 1984, DeBlasio was hired by the NYPD as a police officer.

27.     For decades, DeBlasio performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of, Sergeant, Lieutenant, and Captain, and receipt of consistent performance evaluations rating him above or well above standards, and awards, honors, and recognitions, too numerous to list here.

28.     In May 2007, the NYPD promoted DeBlasio to the rank of Deputy Inspector.

29.     DeBlasio continued to excel in this appointed position, so in May 2011, the Commissioner promoted and designated DeBlasio to the rank of Inspector.

30.     At the time of the relevant events described herein, DeBlasio held the position of Inspector, assigned to Patrol Borough Brooklyn South as operations commander.

31.     At all relevant times, DeBlasio was a member in good standing of the NYPD.

**Job Protections for Captains and Designated Higher Ranks**

32.     Captains are represented by a collective bargaining unit, the Captains Endowment Association ("CEA").

33.     The City and CEA are/were parties to a collective bargaining agreement, entitled the Captains' Endowment Association 2012-2019 Agreement (the "CBA").

34.     Captains may be detailed, appointed, or promoted for other assignments, i.e. ranks, such as Deputy Inspector, Inspector, and Deputy Chief (the "Higher Ranks").

35.     The CEA continues to represent Captains who have been designated for such assignments by the Commissioner.

36.     The CEA and the City have negotiated the terms and conditions of employees represented by the CEA.

37.     A term of employment enjoyed by Captains pursuant to the CBA and New York Civil Service Law is that they cannot be terminated absent notification of charges against the employee and an opportunity to be heard on the charges at a department hearing.

38.     Captains designated or promoted for Higher Ranks serve in such Higher Rank at the pleasure of the Commissioner.

39.     The Commissioner can demote Captains serving in Higher Ranks, at-will, but the Commissioner cannot outright terminate a Higher Rank from employment with the NYPD.

40.     Rather, if the NYPD desires to terminate the employment of Higher Rank, the NYPD must bring charges against the Higher Rank, in the same manner as the NYPD is required

to do for Captains, that is, the NYPD must follow the directives of New York Civil Service §75, as well as NYPD Patrol Procedures 206-06, 206-07, and 206-13.

41.     Additionally, the NYPD must comply with the Rules of the City of New York, 38 15-01, which sets forth the procedures for issuing, serving, and hearing disciplinary charges.

42.     Although Higher Ranks do not enjoy a property interest in the Higher Rank, they have a property interest in their continued employment with the NYPD as a Captain.

43.     Thus, notwithstanding any of the foregoing procedures, Captains, and Captains serving in Higher Ranks, cannot be terminated from the NYPD without being afforded constitutionally adequate due process, meaning a notice of charges and at least a minimal opportunity to be heard on the charges prior to being deprived of their employment, i.e. terminated from the NYPD.

**NYPD Corruption Probe**

44.     As early as 2013, the FBI was conducting an extensive investigation concerning corruption in the NYPD (the "Corruption").

45.     The investigation initially began with Ruel Stephenson, an NYPD inspector who was protecting an establishment owned by Hamlet Peralta.

46.     This investigation then led to the Chief of the Department, Philip Banks ("Banks"), and Corrections Union President, Norman Seabrook ("Seabrook"), including investigations into the investments they had made.

47.     Later, the FBI investigated suspicions that police officers accepted gifts and vacations, in exchange for favors for wealthy New York City businessmen, allegedly Jeremy Reichberg ("Reichberg") and Jona Rechnitz ("Rechnitz").

48.     These businessmen allegedly had ties to Mayor Bill de Blasio, and the suspected

corruption involved the highest-level officials within the NYPD, including the then Chief of Department, Banks.

49.     When the investigation led to a roadblock on Banks and Seabrook at that time, in December 2015, the FBI began to investigate others within the NYPD, the most notable being Deputy Inspector Michael Deddo ("Deddo") who, at the time, was working in NYPD Internal Affairs ("IAB").

50.     As well, there was an investigation of Shaya Alex Lichtenstein, who was later convicted of bribing police offers in the NYPD Gun License Division.

51.     As part of the investigations, the FBI interviewed, or tried to interview, at least fifty (50) high ranking NYPD officials, including the Plaintiffs, and others, such as Deputy Chief Michael Harrington ("Harrington").

52.     In addition to high ranking NYPD officials, more than fifty (50) others were interviewed of other ranks and titles, as well as civilians.

53.     According to sources quoted by the New York Daily News, these interviews were not intended to target the officials as suspects in the investigation, but rather were intended only to obtain information to further the investigation.

54.     Indeed, the FBI interviewed Harrington and asked him about information he had relating to Banks, Seabrook, Reichberg, and Rechnitz.

55.     As part of this ongoing interviewing, on February 25, 2016, FBI agents met with Rodriguez, Colon and others.

56.     The agents questioned them but assured Rodriguez and Colon that they were not targets or subjects of the investigation.

57.     On March 30, 2016, the FBI, as well as IAB, tried to meet with Capul at his home,

but he was not home at the time.

58.     On April 7, 2016, Rodriguez and Colon received calls from the President of the CEA, Roy Richter ("Richter"), telling them that Bratton was going to transfer them because Bratton had to take some action to respond to the articles that were being published about the Corruption.

59.     Richter told Rodriguez that Bratton selected him because Reichberg lived in the Brooklyn south area where Rodriguez worked.

60.     Richter stated that the transfers of Rodriguez and Colon were only temporary, suggesting that this was being done for appearances only, and not because of any wrongdoing.

61.     After consultation with his union and private attorney, Capul arranged to meet with the FBI and IAB on April 8, 2016.

62.     Concerning Capul's April 8, 2016 meeting, investigators assured Capul that he was not a subject or target of any investigation, but rather the investigators were interested in just learning about information of which they believed he had knowledge.

63.     After the April 8, 2016 meeting with Capul, he was again assured that he was not the subject or target of any investigation by the AUSA's office.

64.     Because the allegations led to the highest-ranking NYPD officials, and perhaps directly to the Mayor, who the NYPD was trying to protect, the NYPD believed it needed to take immediate action, at least for public relations purposes.

65.     In fact, when the investigation came to light in April 2016, Bratton told the press on April 7, 2016, that, "The public has expectations of its public officials, of its police department and certainly the leadership of the department.  If those expectations are not met, actions must be taken."

66.     Moreover, Byrne suggested to the press that the corruption was not systemic, but rather confined to a small group of "senior" people, who had "bad judgment."

67.     In other words, Bratton and Byrne were laying the foundation for showing the public that the City, the NYPD, and their leaders, were taking action against the bad actors and that they could have faith in the NYPD because the alleged corruption was confined to a few high-level officials.

68.     Further, because the corruption allegations reached the Mayor's office, the Mayor, the City, and NYPD top leaders, such as the Commissioner and Chief Banks, they had an interest in insulating themselves from the allegations.

69.     Indeed, Bratton noted that this probe did not reach the levels of the 1970s Knapp Commission scandal or the 1990s Mollen Commission scandal.

70.     Accordingly, the NYPD implicated "expendable" deputy chiefs and inspectors – career police officials with impeccable records – while protecting politically tied officers from implication in the Corruption.

71.     For example, on the same day Bratton made these comments, Bratton transferred Colon and Rodriguez to desk duty.

72.     Colon and Rodriguez were not accused of any misconduct, no charges had been filed against them, and they were not subjects of the FBI investigation.

73.     Bratton also transferred Deputy Chief Harrington and Deputy Inspector James Grant ("Grant"), and further stripped these officers of their guns and badges.

74.     On April 13, 2016, just seven days after Bratton's comments and after assurances at the April 8, 2016 meeting that he was a not a target or subject of investigation, Bratton transferred Capul from the highly coveted position as the Executive Officer of Manhattan North,

to an administrative position as executive officer of the School Safety Division.

75.     At the time of his transfer, Capul was considered a highly respected chief with an unblemished record.

76.     Further, Capul was not a target of the FBI's investigation and the NYPD did not accuse or charge Capul with any allegations of corruption or misconduct.

77.     In other words, Capul's transfer was another in a series of actions which the NYPD took to give the appearance that it was addressing the FBI's corruption concerns.

78.     Moreover, Capul's transfer immediately attracted press coverage, with the NYPD telling media that Capul was "reassigned to an administrative position pending further review."

79.     At least one headline from the New York Daily News implicated Capul in the Corruption, reading, "Deputy Chief Andrew Capul is latest officer disciplined in ongoing FBI corruption probe into the NYPD."

80.     Thus, Capul was immediately guilty in the world of public opinion and the NYPD was successfully employing scapegoats to take the heat off of other higher-ranking officials, previously implicated by the press.

81.     On April 29, 2016, FBI agents met DeBlasio.

82.     With respect to DeBlasio, like the others, the agents posed some questions to him, but assured him that he was not a target or subject of the investigation.

83.     After Plaintiffs' meetings with the FBI, Richter told Plaintiffs that they had done nothing wrong.

84.     Richter stated that Plaintiffs were simply witnesses and that everything was going to be handled administratively by the NYPD.

85.     This was confirmed by CEA's attorney, Lou LaPietra, who advised that Plaintiffs

had done nothing wrong.

86.    On May 5, 2016, Richter called Rodriguez to advise that he just left a meeting with Bratton, who informed him that Rodriguez's name had not come up anywhere and that he would soon be back on track with his career.

87.    Richter repeated these promises to Rodriguez on a number of other occasions in May 2016.

88.    Although Plaintiffs told the NYPD and the CEA about their contact with the FBI and further told the NYPD that they would be willing to speak to NYPD investigators about the contact, the NYPD showed no interest in further questioning the Plaintiffs, except for initially notifying DeBlasio that IAB would interview him.

89.    IAB later canceled DeBlasio's scheduled interview.

90.    Richter told DeBlasio that Byrne canceled the interview indefinitely.

91.    But the FBI continued to pursue questioning DeBlasio and obtained a subpoena compelling his testimony at a grand jury.

92.    DeBlasio asserted his Fifth Amendment right to not testify at the grand jury.

93.    After asserting his right, the NYPD placed DeBlasio on modified duty, and transferred him to an administrative position within the Medical Division.

94.    In association with this modification, DeBlasio met with union officials and a union attorney during which Richter told DeBlasio that Bratton and Byrne created two lists – an "arrested" list and a "fired" list.

95.    DeBlasio was placed on the fired list.

96.    On May 20, 2016, Richter told Capul, Rodriguez, and Colon, in separate conversations, that the Commissioner was seeking their retirements, and that the Commissioner

wanted those retirements effective by May 31, 2016.

97.     Speaking to Colon, Richter said, in sum and substance, that Colon had no choice but to retire, because if he did not, the NYPD would file charges against him, charges which were unspecified and unknown.

98.     Richter further reminded Colon that even if he challenged the charges at a hearing, it would not matter because the findings are non-binding, the Commissioner was already intent on terminating Colon, and the Commissioner would in fact terminate Colon notwithstanding the outcome of the hearing.

99.     Capul asked Richter what would happen if he did not retire.

100.    Richter similarly told Capul that the NYPD would file charges against him (unspecified and unknown at the time) and the Commissioner would terminate him, notwithstanding a hearing's outcome.

101.    When speaking to Rodriguez, Richter said that he needed Rodriguez to retire for political reasons and to protect Bratton's legacy because Rodriguez's name had appeared in the newspaper.

102.    However, in the same conversation, Richter told Rodriguez that he did nothing wrong.

103.    Similarly, Richter told Capul, in sum and substance, that the "politics" of the matter required his retirement, but that there were no allegations of misconduct.

104.    Richter further confirmed, in sum and substance, to Colon that there was no legitimate reason for the NYPD to demand his retirement either, but Richter's estimation was that it was a political maneuver, relating to protecting Bratton's legacy.

105.    Richter suggested to Rodriguez and Capul that the NYPD was exploring a number

of ways for them to retire and that he would get back to them with those options.

106.    Upon information and belief, Bratton leaked to the press that Plaintiffs were "tainted" and he wanted them out of the NYPD to put the scandal behind him.[1]

107.    But Bratton's motive was not benign or a genuine attempt to remove wrong-doers from the department as evidenced by the fact that Banks's retirement (and the retirement of other implicated high ranking officials such as Deputy Chief Jimmy McCarthy, Inspectors Ruel Stephenson and Brian McGinn, and Deputy Inspectors Michael Endall and Deddo) was not similarly sought.[2]

108.    Richter advised that if Rodriguez and Capul submitted their retirements, they could do so in a normal manner with all of their accrued time.

109.    Richter further told Rodriguez, Capul, and Colon, that if they retired, they would receive standard NYPD retirement benefits, including a "Good Guy Letter."

110.    Moreover, Richter told Capul that the NYPD would seek formal charges, though Richter could not identify what those charges might be.

111.    Rodriguez, Capul, and Colon asked Richter if they could "run their time."

112.    "Running time" is standard practice for NYPD members at all levels and at every rank.

113.    Running time means that members may use accrued leave time so that they do not

---

[1] The basis of this information and belief is press coverage and testimony in the Plaintiffs' grievance hearing.

[2] In fact, in 2018, according to the New York Times, Banks was set to receive a promotion to Deputy Commissioner, but he suddenly chose, not only to decline the promotion, but to retire completely from the NYPD "a day after a judge approved a FBI wiretap that was part of a sprawling investigation in which the feds found more than $300,000 in 'unexplained' cash deposits into Banks' accounts."

have to report to work, but they remain technically employed by the City.

114.    This has the effect of allowing members to receive their regular salary while at the same time continuing to accrue regular work benefits such as pension contributions.

115.    On May 24, 2016, Richter told Capul and Rodriguez that they could run their time, but to wait because the then Chief of Department, James O'Neill was trying to save their jobs.

116.    Based on his May 20, 2016 conversation with Richter concerning the Commissioner's intent to terminate him at any costs, Colon capitulated to the Commissioner's demands and filed his retirement paperwork on May 24, 2016.

117.    On May 27, 2016, Richter called Rodriguez and Capul to tell them to go to the pension section of the NYPD to submit their papers on May 31, 2016, run their time and then come back when the dust had settled.

118.    On May 31, 2016, Rodriguez met with Richter and other union officials to file his retirement papers with an effective retirement date of May 31, 2018, the date his accrued time would be depleted.

119.    On May 31, 2016, Capul met with Richter and other union officials to finalize his retirement papers, selecting an effective date of August 31, 2018, the date his accrued time would be depleted.

120.    On June 10, 2016, Byrne, via Richter, issued DeBlasio a similar ultimatum – retire or face demotion and the predetermined termination decision from the Commissioner.

121.    DeBlasio initially protested the ultimatum to Richter telling him he would not take the offer, to which Richter said, "don't do it . . . they will demote you and terminate you."

122.    Moreover, that Defendants refused to provide any basis to Plaintiffs as to why charges might be filed or what those charges might consist of, meant that Plaintiffs lacked any

ability whatsoever to determine their chances of success in defending the as yet to be issued charges.

123.   As to DeBlasio, unlike other Plaintiffs, Richter said the ultimatum included forfeiture of his accrued leave and vacation time.

124.   DeBlasio questioned why he could not run his time when he knew that others had been allowed.

125.   Richter said that that was the ultimatum issued by Byrne.

126.   In orchestrating these actions against Plaintiffs, Bratton was not concerned about the Plaintiffs' guilt or innocence, or the fact that no allegations existed to support a basis to lawfully remove the Plaintiffs from employment.

127.   On June 20, 2016, the FBI arrested Harrington, Grant, and two other lower ranking officers from the licensing division in connection with the Corruption.

128.   That same day, Richter, at the direction of Byrne, called Capul and Rodriguez to tell them that the NYPD changed its mind and that they had to waive all their accrued time by June 30, 2016.

129.   Richter also said that Bryne threatened Capul and Rodriguez that if they did not retire that the NYPD would immediately demote them and would initiate proceedings to terminate them.

130.   As noted, the disciplinary proceedings were form over substance, as the Commissioner had already determined that Capul and Rodriguez would be terminated.

131.   By the mere act of demoting Capul and Rodriguez, they would have lost significant benefits, including pay (which would have affected pension contributions and value), and the prestige they had garnered as Deputy Chiefs, which could affect future employment and job

opportunities.

132.    The demand to retire immediately meant that Capul and Rodriguez would lose the opportunity to "run" their accrued time of over two years.

133.    On June 22, 2016, Richter told Capul that Byrne said the CEA members should be "glad to have the opportunity to retire" and that the Harrington and Grant criminal complaints identified a cooperating complainant.

134.    Byrne suggested that this cooperating witness would implicate some of the retiring members in the Corruption.

135.    Later, Plaintiffs would learn that the witness was Rechnitz, who in no way implicated any Plaintiff, meaning that Byrne's statement was a bluff used to extract the Plaintiffs' retirement.

136.    On June 20, 2016, Richter told Colon that running his time was no longer an option and that he must give up his accrued time and be off the books by June 30, 2016.

137.    Byrne, via Richter, stated that Colon must retire or face demotion and termination.

138.    Under such threats and duress, Capul amended his retirement date to June 29, 2016 from August 31, 2018, but signed the form indicating, "Under Duress/Protest."

139.    On or about June 24, 2016, Capul filed his amended retirement making it effective June 30, 2016, and thus forfeited 186 days of vacation and more than 2,800 hours of compensatory time.

140.    In his papers, Capul specifically stated:

> This correspondence is to inform you of my intention to change my lump sum retirement date from 2400 hours 8/31/18 to 6/30/16.  This decision to waive my accrued time (Vacation, Lost Time and Chart Days) is being done under duress/protest.  I was informed on Tuesday, 6/21/16 at approximately 1630 hours, by [Richter] that [Byrne] stated that if I did not change my retirement date to 6/30/16

> (in effect waiving all of my accrued time equaling approximately 2 years and 2 months), I would be demoted from Deputy Chief to Captain in the NYPD. Additionally I would be subject to Departmental Charges and Specifications and face a Hearing, where "Termination Proceedings" would commence.

141. On or about June 27, 2016, Rodriguez filed his amended retirement making it effective June 30, 2016, and thus forfeited 40 days of vacation and more than 3,200 hours of compensatory time.

142. When submitting his papers, Rodriguez told Richter the NYPD's actions were not fair since he did nothing wrong and was being forced to sign papers under duress so as to not be demoted and terminated.

143. In Rodriguez's retirement papers, he stated that he was doing it "under duress and threat of demotion and termination" and that he was not "involved in any criminal contact, nor [was he] subject of any department charges."

144. On June 30, 2016, Colon filed his amended retirement under the same threats and thus forfeited more than 1,000 hours of compensatory time.

145. On July 15, 2016, DeBlasio retired, forfeiting 69 vacation days and more than 1,600 hours of compensatory time.

146. In sum, prior to their forceful retirements, Defendants did not provide to any Plaintiff with a notice of charges, an explanation of evidence and/or witnesses against them, or even a minimal opportunity to be heard.

147. After their retirements, Plaintiffs all received "good guy" letters from Bratton.

148. In August 2016, Plaintiffs commenced the grievance process against the City and the NYPD arguing that their retirements were given under duress and so the forfeiture of their accrued time is void.

149. On July 16, 2018, impartial arbitrator David N. Stein, Esq. agreed with the Plaintiffs and determined that their retirements were given under duress, and that the NYPD deprived them of due process.

150. In Arbitrator Stein's Opinion and Award, he found that "Byrne engaged in a course of action designed to force [Plaintiffs] out by threatening to have a hearing which would culminate in their certain termination" and that such threats "comprised a breach of [Plaintiffs'] statutory and due process rights to a hearing based on evidence which Byrne steadfastly and consistently refused to outline in even a general way."

151. Moreover, Arbitrator Stein factually determined that at the time Plaintiffs' retirements were extracted, the Department had no information whatsoever suggesting that the Plaintiffs had engaged in actionable misconduct and that the Department was threatening to take action which it had no right to take.

152. On January 2, 2019, a jury acquitted Grant of all charges.

153. After the trial, a juror told reporters that Grant "never should have been charged," and that Banks should have been prosecuted instead.

154. Thus, the juror's statements support an inference that innocent officials, such as the Plaintiffs, were given up as scapegoats to protect higher ranking officials, such as the Commissioner.

155. Indeed, the juror told reporters that the entire jury panel believed that Grant was duped, describing him as being a "flunky" and a "pawn."

156. During the trial, subordinates who worked for Michael Endall ("Endall"), Commanding Officer of the License Division, testified that Endall was part of the bribery scheme.

157. Upon information and belief, Endall was never interviewed by the FBI about the

Corruption.

158.    Even though Bratton stated that anyone touched by the investigation had to leave the NYPD, Endall was permitted to stay on the job for an additional ten (10) months, until he was faced with actual charges, which he accepted before he retired.  As well, other high-ranking officials were allowed to stay, including McCarthy, McGinn, and Deddo.

159.    This testimony supported that Plaintiffs were simply made the "fall guys".

160.    In fact, Endall's immediate subordinates offered testimony during trial directly implicating Endall, Bratton, and other high-ranking officials and IAB members, not criminally charged and not driven out of the Department.

161.    Moreover, Harrington was the only single NYPD member convicted of any crime in connection with the Corruption, and his conviction was made as part of a plea arrangement.

162.    Further, NYPD insiders have opined that Harrington's alleged offenses are only questionably federal crimes, and that typically the actions to which he allocuted would be prosecuted only as internal NYPD violations.

163.    That Harrington was criminally prosecuted again suggests that the NYPD was not interested in internal investigations which might expose corruption at the highest levels of City government and NYPD administration, but were instead looking merely for scapegoats.

164.    Harrington was Banks's executive officer, and thus made an easy fall guy – an official high enough and close enough to Banks, yet not Banks himself.

165.    By leveraging Plaintiffs for their resignations, Defendants avoided potential wider probes and exposure which could have resulted from Plaintiffs' defense of charges.

166.    Indeed, if Defendants had issued charges against the Plaintiffs, the Plaintiffs would have been entitled to discovery.

167.    On June 8, 2017, Rodriguez submitted a letter of reinstatement to the NYPD.  To date, Rodriguez has received no response to his request to be reinstated.

168.    On June 15, 2017, Capul submitted a letter of reinstatement to the NYPD.  To date, Capul has received no response to his request to be reinstated.

169.    On June 17, 2017, DeBlasio submitted a letter of reinstatement to the NYPD.  To date, DeBlasio has received no response to his request to be reinstated.

170.    In June 2017, Colon submitted a letter of reinstatement to the NYPD.  To date, Colon has received no response to his request to be reinstated.

### FIRST CAUSE OF ACTION

### (Fourteenth Amendment- Due Process via 42 U.S.C. § 1983)

171.    While acting under color of law, the individual Defendants constructively terminated the Plaintiffs who had a protected property interest in their continued employment. Prior to the termination, the individual Defendants did not provide to Plaintiffs a notice of the charges against them, a hearing, or other any other minimal opportunity to be heard.  The Defendants who made the decisions causing the termination are high-level officials – the Commissioner and Deputy Commissioners – individuals at the highest levels of the NYPD command structure, individuals within the inner circle of the Commissioner of Police and/or who are the Commissioner of Police, and individuals with final authority over employment decisions, including those at issue here.  Moreover, New York State and City Law, as well as internal NYPD rules, provide the procedure for terminating the Plaintiffs.  Accordingly, the individual Defendants' acts were not random and unauthorized.

172.    Defendant, the City, is liable under *Monell v. Dep't of Soc. Servs.*, because the Commissioner directed, approved of, or acquiesced in the decisions causing the deprivations

herein.  Moreover, the decisions herein constitute a policy of the City.  As discussed herein, the Defendants, in consultation with or at the direction of the Mayor, coordinated to terminate these Plaintiffs' employments to effectuate the policy of finding "fall guys" who would deflect and absorb negative press coverage of the Corruption at the highest-levels of the NYPD administration.

   **WHEREFORE**, Plaintiffs demand judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages (where applicable), injunctive relief including a temporary restraining order, preliminary injunction, and permanent injunction compelling Defendants to immediately reinstate Plaintiffs, liquidated damages (where applicable), interest, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiffs are entitled.  Plaintiffs demand a trial by jury.

Dated: May 13, 2019
  Syosset, New York

      Respectfully submitted,
      **LAW OFFICES OF YALE POLLACK, P.C.**

      By: */s/ Yale Pollack*
        Yale Pollack, Esq.
      66 Split Rock Road
      Syosset, New York 11791
      (516) 634-6340
      ypollack@yalepollacklaw.com

      **FAMIGHETTI & WEINICK, PLLC**

      By: */s/ Matthew Weinick*
        Matthew Weinick, Esq.
      25 Melville Park Road, Suite 235
      Melville, New York 11747
      (631) 352-0050
      mbw@fwlawpllc.com

      *Attorneys for Plaintiffs*