UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDREW J. CAPUL, DAVID COLON, ERIC R. RODRIGUEZ, and PETER A. DeBLASIO,

                    Plaintiffs,

                    -v.-

CITY OF NEW YORK, WILLIAM J. BRATTON, *in his individual and official capacities*, and LAWRENCE BYRNE, *in his individual and official capacities*,

                    Defendants.

19 Civ. 4313 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiffs, four former New York City Police Department ("NYPD" or the "Department") officers holding the ranks of Deputy Chief or Inspector, bring this action pursuant to 42 U.S.C. § 1983 against the City of New York, former New York City Police Commissioner William J. Bratton, and former NYPD Deputy Commissioner for Legal Matters Lawrence Byrne.  Plaintiffs assert a single claim — that Defendants deprived them of a property interest in their employment, in violation of their Fourteenth Amendment right to due process, by coercing their resignations from the Department and vitiating the pre-deprivation process that would otherwise be available.  Defendants now move to dismiss the Complaint, arguing that: (i) Plaintiffs have not adequately pleaded that the alleged constitutional deprivations were part of a municipal policy or custom; (ii) Plaintiffs' due process claim is not cognizable because of the post-deprivation process available to them; and (iii) Defendants Bratton

and Byrne are entitled to qualified immunity.  For the reasons explained below, the Court dismisses Plaintiffs' Complaint.

<h1 style="text-align:center">BACKGROUND[1]</h1>

## A.    Factual Background

### 1.    The Plaintiffs

The Court accepts, as it must, the well-pleaded allegations of the Complaint.  Plaintiff Andrew J. Capul was hired by the NYPD in 1984.  (Compl. ¶ 11).  For decades, Capul performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector; receipt of performance evaluations consistently rating him above or well above standards; and several awards, honors, and recognitions.  (*Id.* at ¶ 12).  In June 2015, the NYPD again promoted Capul via a discretionary promotion to the rank of Deputy Chief.  (*Id.* at ¶ 13).  During the relevant time period, Capul held the position of Deputy Chief, assigned to Patrol Borough Manhattan North, which Plaintiffs claim is one of the most highly coveted and respected assignments in the NYPD.  (*Id.* at ¶ 14).

Plaintiff Eric R. Rodriguez was hired by the NYPD in June 1992.  (Compl. ¶ 16).  During his tenure with the NYPD, Rodriguez performed his duties in an

---

[1]    The facts in this Opinion are drawn primarily from Plaintiffs' Complaint ("Complaint" or "Compl." (Dkt. #8)), which is the operative pleading in this case, as well as the Declaration of Yale Pollock ("Pollock Decl." (Dkt. #41)) and its attached exhibit ("Arbitration Award" (Dkt. #41-1)).  For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #39); Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #40); and Defendants' reply brief as "Def. Reply" (Dkt. #44).  Additionally, the Court refers to the Individual Defendants by using the rank that each held during the relevant time period.

exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector; receipt of performance evaluations consistently rating him above or well above standards; and several awards, honors, and recognitions. (*Id.* at ¶ 17). In November 2014, the NYPD again promoted Rodriguez via a discretionary promotion, to the rank of Deputy Chief. (*Id.* at ¶ 18). During the relevant time period, Rodriguez held the position of Deputy Chief, assigned to Patrol Borough Brooklyn South, which Plaintiffs allege is another of the most coveted assignments in the NYPD. (*Id.* at ¶ 19).

Plaintiff David Colon was hired by the NYPD in July 1986. (Compl. ¶ 21). For decades, Colon performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, Captain, Deputy Inspector, and Inspector; receipt of performance evaluations consistently rating him above or well above standards; and several awards, honors, and recognitions. (*Id.* at ¶ 22). In July 2013, the NYPD again promoted Colon via a discretionary promotion, to the rank of Deputy Chief. (*Id.* at ¶ 23). During the relevant time period, Colon held the position of Deputy Chief, assigned to the NYPD's Housing Bureau. (*Id.* at ¶ 24).

Plaintiff Peter A. DeBlasio was hired by the NYPD as a police officer on January 4, 1984. (Compl. ¶ 26). For decades, DeBlasio performed his duties in an exemplary manner as evidenced by, among other things, multiple promotions to the positions of Sergeant, Lieutenant, and Captain; receipt of performance evaluations consistently rating him above or well above standards;

and several awards, honors, and recognitions.  (*Id.* at ¶ 27).  In May 2007, the
NYPD promoted DeBlasio to the rank of Deputy Inspector.  (*Id.* at ¶ 28).
DeBlasio continued to excel in this appointed position, and in May 2011, the
Commissioner promoted and designated DeBlasio to the rank of Inspector.  (*Id.*
at ¶ 29).  During the relevant time period, DeBlasio held the position of
Inspector, assigned to Patrol Borough Brooklyn South as operations
commander.  (*Id.* at ¶ 30).

### 2.    Job Protections for Captains and Designated Higher Ranks

NYPD Officers holding the rank of Captain or higher are represented by a
collective bargaining unit, the Captains Endowment Association (the "CEA").
(Compl. ¶¶ 32, 34).  Captains cannot be terminated absent notification of
charges and an opportunity to be heard on those charges, including being
heard at a Department hearing.  (*Id.* at ¶ 37).  The Commissioner may detail,
appoint, or promote Captains to higher ranks, such as Deputy Inspector,
Inspector, and Deputy Chief (collectively, the "Higher Ranks"), where these
officers would continue to be represented by the CEA.  (*Id.* at ¶¶ 34-35).
Captains designated or promoted to the Higher Ranks serve in such positions
at the pleasure of the Commissioner.  (*Id.* at ¶ 38).  But while the
Commissioner may demote an officer promoted to the Higher Ranks "at will,"
he cannot terminate outright the officer's employment with the NYPD.  (*Id.* at
¶ 39).

If the Commissioner desires to terminate the employment of a person
holding a Higher Rank, the NYPD must bring charges against that person in

the same manner as it is required to do for Captains.  (Compl. ¶¶ 39-40).  That

is, the NYPD must follow the directives of New York Civil Service Law § 75,

NYPD Patrol Procedures 206-06, 206-07, and 206-13, and the Rules of the City

of New York, Title 38, § 15-01.  (*Id.* at ¶¶ 40-41).  Those provisions entitle

officers to, among other things: (i) service of charges and specifications

identifying the "date, time and place" of the alleged misconduct, as well as the

"contract provision, law, policy, regulation or rule that was allegedly violated"

by the officer in question (*see* N.Y.C. Admin. Code Title 38, § 15-03(a)); (ii) an

opportunity for the accused officer to reply to the charges within eight days of

service (if served personally), or thirteen days of service (if served by mail) (*see*

*id.* at § 15-03(c)); (iii) discovery concerning the disciplinary charges, including

"[r]equests for production of relevant documents, identification of trial

witnesses and inspection of real evidence to be introduced at the Hearing" (*see*

*id.* at § 15-03(f)); (iv) a disciplinary hearing where, with the assistance of union

or private counsel, an accused officer can introduce evidence, examine and

cross-examine witnesses, and make opening statements (*see id.* at § 15-04);

and (v) the production to the accused officer of a draft of the report and

recommendation of the Deputy Commissioner of Trials, along with an

opportunity to submit written comments thereto (*see id.* at § 15-06).

### 3.    The NYPD Corruption Probe

In 2013, the Federal Bureau of Investigation (the "FBI") opened an

investigation into corruption in the NYPD that ultimately extended to the Chief

of the Department, Philip Banks, and the President of the Correction Officers

Benevolent Association, Norman Seabrook.  (Compl. ¶¶ 44-46).  The FBI was
investigating allegations that police officers accepted gifts and vacations from
two wealthy New York City businessmen, Jeremy Reichberg and Jona Rechnitz,
in exchange for favors.  (*Id.* at ¶ 47).  In December 2015, when the investigation
hit an impasse with regard to Banks and Seabrook, the FBI began to
investigate others within the NYPD, the most notable being Deputy Inspector
Michael Deddo, then working in the NYPD Internal Affairs Bureau ("IAB").  (*Id.*
at ¶ 49).  As part of the investigation, the FBI interviewed, or attempted to
interview, at least 50 high-ranking NYPD officials, including Plaintiffs, and 50
other NYPD employees, uniformed and civilian.  (*Id.* at ¶¶ 51-53).  When
Rodriguez and Colon were interviewed on February 25, 2016, the FBI agents
interviewing them assured them that they were not targets of the investigation.
(*Id.* at ¶¶ 55-56).

On April 7, 2016, Rodriguez and Colon received calls from the President
of the CEA, Roy Richter, telling them that Commissioner Bratton was going to
transfer them because the Commissioner had to take some action in response
to articles that were being published about the corruption.  (Compl. ¶ 58).
Richter told Rodriguez that Commissioner Bratton selected him because
Reichberg lived in the Brooklyn South area where Rodriguez worked.  (*Id.* at
¶ 59).  Richter also told Rodriguez and Colon that the transfers were only
temporary, suggesting that this was being done for appearances only, and not
because of any wrongdoing.  (*Id.* at ¶ 60).

After consultation with his union and private attorneys, Capul arranged to meet with the FBI and IAB on April 8, 2016.  (Compl. ¶ 61).  At the meeting, investigators assured Capul that he was not a subject or target of any investigation, but rather, that the investigators were interested in learning information Capul was believed to possess.  (*Id.* at ¶ 62).  After the April 8, 2016 meeting, Capul was again assured that he was not the subject or target of any investigation by the United States Attorney's Office.  (*Id.* at ¶ 63).

Because the allegations of wrongdoing inculpated high-ranking NYPD officials, if not the Mayor himself — whom, it is alleged, the NYPD was trying to protect — the NYPD believed it needed to take immediate action, at least for public relations purposes.  (Compl. ¶ 64).  When the investigation came to light in April 2016, Commissioner Bratton told the press on April 7, 2016, that "[t]he public has expectations of its public officials, of its police department and certainly the leadership of the department.  If those expectations are not met, actions must be taken."  (*Id.* at ¶ 65).  Meanwhile, Deputy Commissioner Byrne suggested to the press that the corruption was not systemic, but rather was confined to a small group of "senior" people who had "bad judgment."  (*Id.* at ¶ 66).  In so doing, Commissioner Bratton and Deputy Commissioner Byrne could suggest to the public that (i) the City, the NYPD, and NYPD leaders were taking action against the bad actors, and (ii) they could have faith in the NYPD because the alleged corruption was confined to a few high-level officials.  (*Id.* at ¶ 67).

Plaintiffs allege that rather than going after the corrupt NYPD officials, Commissioner Bratton instead implicated "expendable" deputy chiefs and inspectors — career police officials with impeccable records — while protecting politically tied officers. (Compl. ¶ 70). In essence, Plaintiffs claim that they were the scapegoats for others' corruption. For example, on the day that Commissioner Bratton spoke out publicly regarding the corruption investigation, he transferred Colon and Rodriguez to desk duty, despite the fact that they had not been accused of any misconduct, no charges had been filed against them, and they were not subjects of the FBI investigation. (*Id.* at ¶¶ 71-72). Commissioner Bratton also transferred Deputy Chief Harrington and Deputy Inspector James Grant and further stripped these officers of their guns and badges. (*Id.* at ¶ 73).

On April 13, 2016, just a week after Capul's meeting with the FBI and IAB, Commissioner Bratton transferred Capul from the highly coveted position of Executive Officer of Manhattan North to an administrative position as executive officer of the School Safety Division. (Compl. ¶ 74). At the time of his transfer, Capul was considered a highly respected chief with an unblemished record. (*Id.* at ¶ 75). Further, Capul was not a target of the FBI's investigation, and the NYPD did not accuse Capul of corruption or misconduct. (*Id.* at ¶ 76).

Put simply, Capul's transfer was yet another in a series of actions that the NYPD took to give the appearance that it was addressing the FBI's corruption concerns. (Compl. ¶ 77). Unfortunately for him, Capul's transfer immediately attracted press coverage, with the NYPD telling the media that

Capul had been "reassigned to an administrative position pending further review." (*Id.* at ¶ 78). At least one headline from the New York Daily News implicated Capul in the corruption scandal, reading, "Deputy Chief Andrew Capul is latest officer disciplined in ongoing FBI corruption probe into the NYPD." (*Id.* at ¶ 79). So while Capul was found guilty in the court of public opinion, the NYPD successfully deflected attention from other, higher-ranking officials who had been previously been the subject of press attention. (*Id.* at ¶ 80).

On April 29, 2016, DeBlasio met with FBI agents, at which time he was assured that he was not the target or subject of the investigation. (Compl. ¶¶ 81-82). Indeed, after Plaintiffs' meetings with the FBI, Richter told each Plaintiff that he had done nothing wrong. (*Id.* at ¶ 83). Richter stated that Plaintiffs were simply witnesses and that everything would be handled administratively by the NYPD. (*Id.* at ¶ 84). This was confirmed by CEA attorney Lou LaPietra, who advised that Plaintiffs had done nothing wrong. (*Id.* at ¶ 85). On May 5, 2016, Richter called Rodriguez to advise that he had just left a meeting with Commissioner Bratton, who informed Richter that Rodriguez's name had not come up anywhere and that he would soon be back on track with his career. (*Id.* at ¶ 86). Richter repeated these promises to Rodriguez on a number of other occasions in May 2016. (*Id.* at ¶ 87).

Although Plaintiffs told the NYPD and the CEA about their contacts with the FBI, and even advised the NYPD that they would be willing to speak to NYPD investigators about these contacts, the NYPD showed no interest in

9

further questioning Plaintiffs, except for initially notifying DeBlasio that IAB would interview him.  (Compl. ¶ 88).  IAB later cancelled DeBlasio's scheduled interview.  (*Id.* at ¶ 89).  Richter told DeBlasio that Deputy Commissioner Byrne cancelled the interview indefinitely.  (*Id.* at ¶ 90).

### 4. Plaintiffs' Forced Resignations

In May 2016, Commissioner Bratton and Deputy Commissioner Byrne created two lists for officers implicated by the FBI's investigation, regardless of proof (or even suspicion) of wrongdoing: a "fired" list and an "arrested" list. (Compl. ¶ 94).  DeBlasio was put on the fired list.  (*Id.* at ¶ 95).  Then, on May 20, 2016, Richter told Capul, Rodriguez, and Colon, in separate conversations, that Commissioner Bratton was seeking their retirements, and that the Commissioner wanted those retirements effective as of May 31, 2016.  (*Id.* at ¶ 96).  Richter conveyed to Plaintiffs the seriousness of the Commissioner's intent with a threat: if Plaintiffs did not retire, the NYPD would charge them and terminate them notwithstanding the outcomes of their respective hearings. (*Id.* at ¶¶ 97-104).

Richter told Colon, in sum and substance, that Colon had no choice but to retire, because if he did not, the NYPD would file unspecified charges against him.  (Compl. ¶ 97).  Richter further reminded Colon that even if he challenged the as-yet-unknown charges at a hearing, it would not matter because the findings would be non-binding; the Commissioner was already intent on terminating Colon; and the Commissioner would in fact terminate Colon notwithstanding the outcome of the hearing.  (*Id.* at ¶ 98).

10

According to Plaintiffs, Commissioner Bratton's demand that Plaintiffs retire represented the City's policy of removing "tainted" employees from the Department so that the Department could put the scandal behind it.  (Compl. ¶ 106).  Significantly, however, Commissioner Bratton's motive was not benign, nor were his actions genuine efforts to remove wrongdoers from the Department, as evidenced by the fact that Banks's retirement (and the retirement of other implicated high-ranking officials, such as Deputy Chief Jimmy McCarthy, Inspectors Stephenson and Brian McGinn, and Deputy Inspectors Michael Endall and Deddo) was not similarly sought.  (*Id.* at ¶ 107).

Ultimately, Commissioner Bratton, through Richter, presented each Plaintiff with an ultimatum: retire immediately and retain certain benefits or face disciplinary charges that would result in certain termination.  (Compl. ¶¶ 108-25).  No one, including neither of the Individual Defendants, informed any Plaintiff of any charge against him, or of any basis that could give rise to any charge against him.  (*Id.* at ¶¶ 122, 126, 146).  For this reason, Plaintiffs were unable to gauge the chance of success in defending against any such charges.  (*Id.* at ¶ 122).

Faced with the threat of losing substantial employment benefits that would be forfeited in the event of a termination, but not a retirement, each Plaintiff submitted retirement papers per the Commissioner's direction. (Compl. ¶ 146).  Colon capitulated to the Commissioner's demand and filed his retirement paperwork on May 24, 2016.  (*Id.* at ¶ 116).  Rodriguez filed amended retirement paperwork on or about June 27, 2016.  (*Id.* at ¶ 141).

11

Capul filed amended retirement paperwork on June 29, 2016.  (*Id.* at ¶ 138).

DeBlasio filed retirement paperwork on July 16, 2016.  (*Id.* at ¶ 145).  After

their retirements, Plaintiffs all received "good guy" letters from Commissioner

Bratton.  (*Id.* at ¶ 147).[2]

   In August 2016, Plaintiffs commenced the grievance process against the

City and the NYPD, pursuant to their collective bargaining agreement, arguing

that they had retired under duress, such that the forfeiture of their accrued

time had been void.  (Compl. ¶ 148).  Of potential significance to the instant

motion, while Plaintiffs grieved their benefit calculations, they elected not to

grieve the circumstances of their departures from the NYPD through an Article

78 proceeding in New York State Supreme Court.  (Dkt. #36 at 7-10).  On

July 16, 2018, hearing officer David N. Stein agreed with Plaintiffs and

determined that their retirements were given under duress.  (Compl. ¶ 149; *see*

*generally* Arbitration Award).  In Arbitrator Stein's Opinion and Award, he

found it "clear that the Department interfered with the grievants' exercise of

their rights to run their accrued compensatory time and unusual annual leave

prior to retirement.  The Department's actions amounted to a breach of [their

collective bargaining agreement]."  (Arbitration Award 39).

   In June 2017, all four Plaintiffs submitted letters of reinstatement to the

NYPD.  (Compl. ¶¶ 167-70).  None of the Plaintiffs received a response.  (*Id.*).

---

[2]     A "good guy letter" is a letter that states, in relevant part, that the subject of the letter
retired from the NYPD in good standing, and it is a requisite for the subject to obtain a
license to carry a pistol as a retiree.

### B.      Procedural History

Plaintiffs filed the Complaint in this action on May 13, 2019, asserting

one cause of action for the violation of their due process rights under the

Fourteenth Amendment.  (Dkt. #1).  On July 12, 2019, Defendants filed a letter

seeking to have this case consolidated with another case, *Grant* v. *City of New*

*York, William J. Bratton and Lawrence Byrne*, No. 19 Civ. 4334 (ALC), brought

by another former NYPD employee, which was proceeding before Judge Carter.

(Dkt. #21).  On July 24, 2019, Plaintiffs filed a letter in opposition to the

motion to consolidate.  (Dkt. #28).  The plaintiff in *Grant* also filed a letter

opposing Defendants' requested consolidation.  (Dkt. #29).  On July 29, 2019,

the Court denied the motion to consolidate the cases.  (Dkt. #30).

On August 9, 2019, Defendants filed a letter seeking a pre-motion

conference concerning their anticipated motion to dismiss.  (Dkt. #31).

Plaintiffs filed a letter in opposition on August 13, 2019.  (Dkt. #32).  The Court

held a pre-motion conference on September 16, 2019.  (Dkt. #36 (transcript)).

At that conference the Court set a briefing schedule and ordered discovery

stayed pending resolution of Defendants' motion to dismiss.  (*See id.*).

On October 28, 2019, Defendants filed their motion to dismiss.  (Dkt.

#38, 39).  Defendants' motion asserts three grounds for dismissal: (i) Plaintiffs

fail to state a claim for municipal liability against the City of New York;

(ii) Plaintiffs' due process claim fails as a matter of law; and (iii) Commissioner

Bratton and Deputy Commissioner Byrne are entitled to qualified immunity.

(*See generally* Dkt. #39).  On December 2, 2019, Plaintiffs filed a brief and

declaration in opposition to Defendants' motion.  (Dkt. #40, 41).  Defendants filed a reply brief on December 20, 2020.  (Dkt. #44).  On March 18, 2020, Plaintiffs filed a letter alerting the Court to a supplemental authority from the Second Circuit Court of Appeals.  (Dkt. #45).  Accordingly, the motion is fully briefed and ripe for decision.

## DISCUSSION

### A.   Applicable Law

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  A complaint is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013).  But while a plaintiff must demonstrate the plausibility of his claims, he need not show that a judgment in his favor is probable.  *Iqbal*, 556 U.S. at 678.

### B.   Analysis

Defendants assert three arguments in support of their motion to dismiss the Complaint.  *First*, they argue that the claims against the City of New York and the Individual Defendants in their official capacities cannot proceed because Plaintiffs have not adequately pleaded that the alleged constitutional deprivations were part of a municipal custom or policy.  (*See* Def. Br. 6-10).

14

*Second*, they argue that Plaintiffs' claim that their resignations were coerced is not actionable as a due process violation because Plaintiffs could have sought to challenge the voluntariness of their resignations via an Article 78 special proceeding in New York State Supreme Court.  (*See id.* at 10-14).  *Third*, Defendants argue that Commissioner Bratton and Deputy Commissioner Byrne are shielded from suit by the doctrine of qualified immunity.  (*See id.* at 14-15). The Court addresses Defendants' second argument first, as that issue is dispositive.

### 1.     Plaintiffs Have Failed to State a Procedural Due Process Claim

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause thus bars arbitrary government action, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property. *See Daniels* v. *Williams*, 474 U.S. 327, 331 (1986).  "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Patterson* v. *City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg* v. *Kelly*, 397 U.S. 254, 267 (1970)).

A procedural due process claim comprises two elements: (i) the existence of a property or liberty interest that was deprived; and (ii) deprivation of that interest without due process.  *Bryant* v. *New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012); *Ciambriello* v. *Cty. of Nassau*, 292 F.3d 307, 313 (2d

Cir. 2002).  Defendants do not contest that Plaintiffs had a property interest in their employment with the NYPD.  (*See* Def. Br. 10).  Rather, they contend that Plaintiffs' claim fails under the second prong of the analysis because, notwithstanding Defendants' purported violation of various procedural safeguards, the State provided other procedures to protect Plaintiffs' property interests in the face of those violations.  (*See id.*).  Thus, the question is whether the process afforded to Plaintiffs was sufficient to satisfy the requisites of the Due Process Clause.

Plaintiffs argue that when the property interest at stake is continued employment, the Constitution requires pre-deprivation process, including some kind of hearing, notice of the charges, an explanation of the employer's evidence, and an opportunity to present the employee's side of the story.  (*See* Pl. Opp. 10 (citing *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 538-46 (1985))).  Thus, the crux of the dispute is whether, when a state employee is coerced to resign from employment, the employee must be afforded pre-deprivation process or whether post-deprivation process, in the form of an Article 78 proceeding, suffices.  Resolution of this issue requires a careful study of Supreme Court and Second Circuit precedent.

### a.   Pre-Deprivation Process Is Not Required Where Plaintiffs Resign Their Employment, Even If Coerced to Do So

In *Parratt* v. *Taylor*, 451 U.S. 527 (1981), the Supreme Court acknowledged the many cases in which it had held that due process requires a pre-deprivation hearing before the state interferes with any liberty or property interest.  *Id.* at 537-38.  However, the Court also "recognized that post-

16

deprivation remedies made available by the State can satisfy the Due Process

Clause." *Id.* at 538.  In particular, the Court

> recognize[d] that either the necessity of quick action by
> the State or the impracticality of providing any
> meaningful pre-deprivation process, when coupled with
> the availability of some meaningful means by which to
> assess the propriety of the State's action at some time
> after the initial taking, can satisfy the requirements of
> procedural due process.

*Id.* at 539.  The Court then summarized its teachings in the area:

> Our past cases mandate that some kind of hearing is
> required at some time before a State finally deprives a
> person of his property interests.   The fundamental
> requirement of due process is the opportunity to be
> heard and it is an "opportunity which must be granted
> at a meaningful time and in a meaningful manner."
> *Armstrong* v. *Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187,
> 1191, 14 L.Ed.2d 62 (1965).   However, … we have
> rejected the proposition that "at a meaningful time and
> in a meaningful manner" *always* requires the State to
> provide a hearing prior to the initial deprivation of
> property.   This rejection is based in part on the
> impracticability in some cases of providing any pre-
> seizure hearing under a state-authorized procedure,
> and the assumption that at some time a full and
> meaningful hearing will be available.

*Id.* at 540-41 (emphasis in original).

The Court further explained that "[t]he justifications which we have

found sufficient to uphold takings of property without any pre-deprivation

process are applicable to a situation such as the present one involving a

tortious loss of a prisoner's property as a result of a random and unauthorized

act by a state employee." 451 U.S. at 541.  The Court reasoned that in such

cases, the loss is not the result of some established state procedure and the

state cannot predict precisely when the loss will occur.  *Id.*  Because the

deprivation in *Parratt*, which was caused by the negligent misplacement of a prisoner's property, was beyond the control of the state, it would have been impracticable and impossible for the state to provide a meaningful hearing before the deprivation. *Id.* At the same time, excusing the pre-deprivation hearing because the deprivation was random and unauthorized did not excuse the state from providing a meaningful post-deprivation remedy. *Id.* The Court held that the State of Nebraska's tort remedy provided sufficient post-deprivation process. *Id.* at 543.

Three years later, in *Hudson* v. *Palmer*, 468 U.S. 517 (1984), the Supreme Court extended the reasoning of *Parratt* to intentional deprivations of property. *Id.* at 533. As just discussed, the *Parratt* Court had reasoned that when deprivations of property are effected through random and unauthorized conduct of a state employee, pre-deprivation procedures are simply impracticable, since the state cannot know when such deprivations will occur. *Id.* The *Hudson* Court could discern no logical distinction between negligent and intentional deprivations of property, insofar as the "practicability" of affording pre-deprivation process was concerned, because the state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees that it can anticipate negligent conduct. *Id.* Accordingly, the Court concluded that even intentional deprivations of property, if random and unauthorized, do not violate the Due Process Clause if adequate post-deprivation remedies are available. *Id.*

18

The Second Circuit had occasion to apply the principles of *Parratt* and *Hudson* in *Giglio* v. *Dunn*, 732 F.2d 1133 (2d Cir. 1984). In that case, Giglio was a tenured high school principal who resigned after the school district's superintendent began harassing him with the intent of inducing him to have a nervous breakdown. *Id.* at 1134. Giglio claimed that he had been forced to take full-time disability leave due to mental health issues occasioned by the harassment. *Id.* Six months later, the district and board superintendents, who were "acting at the direction" of the school board's trustees, told Plaintiff "that the Board of Education would abolish his position at a meeting that evening unless he agreed to return to work" by a date certain. *Id.* Giglio informed the superintendents that he could not return to work because of his condition, but he was again informed that his position would be abolished unless he agreed to resign. *Id.* Instead of facing a vote at the meeting, Giglio resigned several hours after receiving these threats. *Id.* Giglio then filed suit alleging that his resignation had been coerced and that he had been denied due process because a hearing did not precede the coercion. *Id.* The district court dismissed Giglio's complaint for failure to state a claim, holding that a pre-coercion hearing would have been "not only impractical but virtually impossible," and, further, that Giglio's post-deprivation remedy under Article 78 of the New York Civil Practice Law, "which is an amalgam of the common law writs of certiorari to review, mandamus, and prohibition," provided adequate due process. *Id.*

The Second Circuit agreed that Giglio's post-deprivation remedies afforded him sufficient process, explaining that "[h]ad an Article 78 hearing been held, the court, with all the facts before it, could have determined whether [Giglio's] resignation was coerced, and avoiding the constitutional thicket, could have ordered such reinstatement and monetary relief as was appropriate." 732 F.2d at 1134. The Court observed that resignations (even if not truly voluntary) are distinguishable from ordinary firings for two reasons: (i) a resignation is not a unilateral act on the part of the employer; and (ii) it does not purport to be for cause. *Id.* And because a coerced resignation is "simply the submission by an employee to pressure exerted by a superior … it is hard to visualize what sort of prior hearing the Constitution would require the employer to conduct." *Id.* at 1135. Thus, where an Article 78 proceeding would give the employee a meaningful opportunity to challenge the voluntariness of his resignation, the employee is not deprived of due process simply because he failed to avail himself of that opportunity. *Id.*

The Second Circuit continues to cite *Giglio* with approval. In *Jaeger* v. *Bd. of Educ. of Hyde Park Central School Dist.*, 1997 WL 625006 (TABLE), 125 F.3d 844 (2d Cir. 1997) (summary order), the plaintiff alleged that he had been coerced into resigning by the Board of Education. *Id.* at *1. The Court found that the plaintiff failed to state a due process violation because he had not established a protected interest in his job. *Id.* at *2. The Court went on to find that, even if the plaintiff had a protected interest in continued employment, his due process claim would still fail because of the availability of an Article 78

20

proceeding that "provides the victim of an allegedly coerced resignation with adequate procedural protection." *Id.*  Citing *Giglio*, the Court held that the Board of Education was not required to show that a pre-deprivation hearing was impossible.  *Id.*

The plaintiff in *Stenson* v. *Kerlikowske*, 2000 WL 254048 (TABLE), 205 F.3d 1324 (2d Cir. 2000) (summary order), similarly alleged that he had been coerced into resigning by the City of Buffalo Police Department after a positive drug test.  *Id.* at *1.  On appeal, Stenson argued that the district court had erred in concluding that the pre-deprivation process that he received satisfied the notice requirements for public-sector employees that had been set forth by the Supreme Court in *Loudermill*, 470 U.S. 532.  *Id.*  The *Stenson* Court began by summarizing the law as clarified by the Supreme Court:

> The Court explained in *Loudermill* that a pre-deprivation hearing ensures that there is "a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [470 U.S.] at 545-56.  Thus, a tenured public employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546.

*Id.*  However, the Court went on to explain that Stenson's case was distinguishable because he alleged that he had been coerced into resigning.  *Id.* Citing *Giglio*, the Court held that a pre-deprivation hearing was neither feasible nor constitutionally required in such circumstances.  *Id.*  In so doing, the Court reaffirmed that when an employee claims that he was coerced to resign, an Article 78 proceeding provides him with sufficient process.  *Id.*

District courts also continue to rely on *Giglio* in cases involving coerced resignations. As but one example, in *Cole-Hatchard* v. *Hoehmann for Town of Clarkstown, N.Y.*, No. 16 Civ. 5900 (VB), 2017 WL 4155409 (S.D.N.Y. Sept. 18, 2017), a former employee of the Clarkstown Police Department brought suit alleging that he had been deprived of due process when he was forced to resign. *Id.* at *7. Citing *Giglio* and *Stenson*, the district court held that because the plaintiff elected not to bring an Article 78 proceeding to challenge the voluntariness of his resignation, the allegation that he was denied due process was implausible. *Id.*

This line of cases would seem to apply squarely to the facts of the instant case. Here, too, Plaintiffs allege that Defendants violated their procedural due process rights in short-circuiting established state procedures for terminating them. Here, too — like the plaintiffs in *Giglio, Jaeger, Stenson*, and *Cole-Hatchard* — Plaintiffs short-circuited the pre-deprivation notice and heading procedures to which they were entitled by resigning. If Plaintiffs had wanted to be served with notice of the charges against them, followed by an opportunity to be heard, as they now claim, they could have rejected the demand that they retire, and invoked their rights to be disciplined pursuant to established procedures. Instead, Plaintiffs strategically avoided the filing of charges against them — and the procedural protections attendant to the filing of such charges — by resigning.

### b.   *Giglio* Applies to Plaintiffs' Claim

In response to these cases, Plaintiffs advance two arguments: (i) the *Giglio* line of cases does not apply here; and (ii) *Giglio* is no longer good law. Plaintiffs' first argument is premised on the contention that *Giglio* applies only where the deprivation was random and unauthorized, and that when the deprivation was based on established procedures, pre-deprivation process is required.  (Pl. Opp. 13-14).  Plaintiffs assert that their resignations, coerced by high-ranking decision makers, were not "random and unauthorized," as in *Giglio*, but rather were entirely foreseeable and predictable to Defendants, thereby entitling Plaintiffs to pre-deprivation process.  (*See id.* at 15-17).

Plaintiffs miss the point of *Giglio* and its progeny.  While it is true that the Second Circuit has held that deprivations caused by high-ranking decision-makers are not random and unauthorized —and may therefore require pre-deprivation process — those cases do *not* address deprivations caused by resignations.  *See, e.g.*, *Hellenic American Neighborhood Action Committee ("HANAC")* v. *City of New York*, 101 F.3d 877 (2d Cir. 1996) (addressing claim by city contractor that it was debarred from obtaining city procurement without due process of law)*; Rivera-Powell* v. *N.Y. Bd. of Elections,* 470 F.3d 458 (2d Cir. 2006) (addressing whether judicial candidate was removed from ballot without procedural due process); *see also Henry* v. *City of New York*, 638 F. App'x 113 (2d Cir. 2016) (summary order) (addressing due process claim brought by plaintiffs who were terminated from employment); *DeSimone* v. *Bd. of Educ. S. Huntington Union Free Sch. Dist.,* 604 F. Supp. 1180 (E.D.N.Y. 1985)

(addressing claim brought by tenured teacher who was terminated by Board of Education).[3]  The point of *Giglio* is that resignations, even if involuntary, differ from firings and other typical deprivations in that they are not unilateral acts on the part of the employer and they do not purport to be for cause.  *See Giglio*, 732 F.2d at 1134-35 ("When an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance.").

Plaintiffs cite no binding authority for the proposition that pre-deprivation process is required where a plaintiff resigns, even if the resignation was allegedly coerced by a high-ranking decision-maker.[4]  And the distinction between firings and resignations makes practical sense:  When an employee resigns, as opposed to being terminated, the defendant "ha[s] no opportunity or reason to bring him up on charges, or to hold a hearing," inasmuch as the employee quit before giving the defendant an opportunity to do so.  *Fortunato* v.

---

[3]    Plaintiffs cite *Moffitt* v. *Town of Brookfield*, 950 F.2d 880 (2d Cir. 1991).  But the only support for their argument in *Moffit* is in a footnote in the background section of the opinion consisting of dicta, which states that "[i]f Moffit was coerced into surrendering a job in which he had a constitutionally protected property interest, a violation of section 1983 occurred."  *Id.* at 883 n.2.  The dispositive issue in that case was whether the appellate court had jurisdiction over the district court's denial of qualified immunity.  *See generally id.* at 881-87.

[4]    Plaintiffs cite several cases from courts outside of the Second Circuit that, they claim, support their argument that pre-deprivation process must be afforded to those who are constructively discharged.  (*See* Pl. Opp. 11-12 (citing *Findesian* v. *North East Ind. Sch. Dist.*, 749 F.2d 234 (5th Cir. 1984)); *id.* at 14 (citing *Lauck* v. *Campbell Cty.*, 627 F.3d 805, 812-13 (10th Cir. 2010); *Knappenberger* v. *City of Phoenix*, 566 F.3d 936, 941 (9th Cir. 2009); *Eggers* v. *Moore*, 257 F. App'x 993, 995 (6th Cir. 2007); *Hargray* v. *Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995); *Fowler* v. *Carrollton Public Lib.*, 799 F.2d 976, 981 (5th Cir. 1986); *Rao* v. *Gondi*, 14 C 66, 2015 U.S. Dist. LEXIS 173049, at *7-11, 2015 WL 9489908 (N.D. Ill. Dec. 30, 2015)).  However, *Giglio* is the case that is binding on this Court.

24

*Liebowitz*, No. 10 Civ. 2681 (AJN), 2012 WL 6628028, at *6 (S.D.N.Y. Dec. 20, 2012).

Perhaps more importantly, the Second Circuit in *Stenson* explicitly rejected the argument Plaintiffs make here, albeit in a summary order. Stenson, who resigned from his position, argued that "an Article 78 proceeding only suffices when the underlying deprivation was random, unauthorized, or unforeseeable, and that the Buffalo Police Department was required to provide [him with] an administrative hearing [] since the deprivation was predictable and authorized pursuant to the official Drug Testing Policy." 2000 WL 254048, at *1. The Court disagreed, reasoning that "since Stenson alleges that he was coerced into resigning, the underlying deprivation was sufficiently unforeseeable that the availability of an Article 78 proceeding provided Stenson with a 'meaningful opportunity to challenge the voluntariness of his resignation' sufficient to ensure due process." *Id.* (quoting *Giglio*, 732 F.2d at 1135).

Unsurprisingly, district courts in this Circuit have also rejected this argument. For example, in *Silverman* v. *City of New York*, No. 98 Civ. 6277 (ILG), 2001 WL 1776157 (E.D.N.Y. Nov. 19, 2001), the plaintiff alleged that he was entitled to pre-deprivation process despite his resignation because his deprivation had been occasioned "not by the random and unauthorized acts of low-level employees, but rather by individuals who had final authority over the decision-making process." *Id.* at *2 (internal quotation marks omitted). The district court explained why this argument was unavailing:

> The problem with Silverman's new allegations, however, is that they fail to address a problem the Court previously noted with respect to these claims: the fact that Silverman was not terminated from his position, but rather resigned.  In such a situation, it is hard to visualize what sort of prior hearing the Constitution would require the employer to conduct, because the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance.  Accordingly, such a hearing would make little sense.  Instead, Silverman should have availed himself of the post-deprivation remedy available to him: the commencement of an Article 78 proceeding.
>
> Silverman argues that, because the persons who allegedly coerced him to resign are "municipal policymakers," an Article 78 proceeding is not an adequate post-deprivation remedy.  Nothing in *Giglio*, however, suggests that the holding in that case should apply with any less force where an employee resigns due to a municipal policy, as opposed to a "random, unauthorized act" of a low-level employee.  In fact, in *Stenson*, the Second Circuit squarely rejected the distinction Silverman asks the Court to draw.

*Id.* at *3 (internal citations and quotations omitted).

Similarly, in *Dodson* v. *Bd. of Educ. of the Valley Stream Union Free Sch. Dist.*, 44 F. Supp. 3d 240 (E.D.N.Y. 2014), the district court applied *Giglio* to dismiss a tenured high school teacher's due process claim that he had been coerced into resigning, even as the court found that the deprivation had been caused by a school board and district that, the court explicitly held, maintained municipal policymaking authority.  *Id.* at 247-49.  And in *Weslowski* v. *Zugibe*, 14 F. Supp. 3d 295 (S.D.N.Y. 2014), the district court held that

> whether a deprivation was "random and unauthorized" or whether it was pursuant to "established government

> procedures" is "moot" in the context of a public
> employee's wrongful-termination claim, because ... an
> Article 78 proceeding ... allows a petitioner specifically
> to raise claims that the employer was biased and
> prejudged the outcome of the termination process.

*Id.* at 316 (internal quotation marks and alterations omitted).

The distinction between resignations and terminations is perhaps made most clear in *Fortunato,* which involved both.  In that case, the defendants, having mistaken the plaintiff for a probationary rather than permanent employee, terminated him without a hearing.  2012 WL 6628028, at *2-3. Roughly a month after his termination, he was reinstated to his position.  *Id.* at *4.  However, on the day that the plaintiff returned to work, he found the conditions of his reinstatement unacceptable and resigned from his position, describing his resignation as a constructive discharge.  *Id.*  The plaintiff brought claims alleging that his procedural due process rights had been violated by both his original termination and his constructive discharge.  *Id.* at *4-7.

The district court dismissed the plaintiff's due process claim premised on his constructive discharge, observing that that

> [a] substantial line of Second Circuit precedent has held
> that, in the case of an alleged constructive discharge in
> New York, the lack of a hearing *before* a plaintiff's
> resignation — *i.e.,* before the plaintiff's alleged
> constructive discharge — does not deprive the plaintiff
> of procedural due process because New York has
> provided an opportunity for a post-deprivation hearing.

2012 WL 6628028, at *4.  In this regard, the plaintiff had argued that a pre-deprivation hearing would have been practical in his situation, because it was

27

obvious to defendants that they were forcing him to resign. *Id.* at *5.  The court rejected this argument, citing *Stenson,* explaining that the issue in a case of a coerced resignation is *not* whether the deprivation is random, unauthorized, or foreseeable. *Id.*  Rather, the Second Circuit has established a categorical rule that a pre-deprivation hearing is impractical in cases of coerced resignation. *Id.*[5]

Plaintiffs urge the Court to adopt a proposition made in dicta in *DeSimone,* 604 F. Supp. at 1184, that *Giglio* would have been decided differently if Giglio had been coerced to resign pursuant to formal official action by the Board of Education, rather than as a consequence of informal, unofficial, and unauthorized threats by individual superiors.  (Pl. Opp. 17).  This Court demurs.  Even if this distinction were relevant in the context of a coerced resignation, Plaintiffs' coerced resignations were not caused by formal action of the City or official municipal policy.  The relevant question is, instead, whether the deprivation was effectuated pursuant to established state procedures or in violation of them, even when the decision is made by a high-ranking person.

---

[5]   Following this logic, the Court found a plausible due process claim with respect to the plaintiff's claim for his termination. *Fortunato* v. *Liebowitz,* No. 10 Civ. 2681 (AJN), 2012 WL 6628028, at *6 (S.D.N.Y. Dec. 20, 2012).  There, the question of whether the deprivation occurred pursuant to established state procedures or random, unauthorized acts of state employees *was* relevant. *Id.*  That is, in answering this question, it did matter whether the defendants were the ultimate decision-makers because, if so, the deprivation would not be considered random and unauthorized conduct. *See id.*

This distinction was addressed in *HANAC*, where the Second Circuit began by summarizing the law with respect to due process violations:

> When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees. *See Hudson* v. *Palmer*, 468 U.S. 517, 532, 104 S. Ct. 3194, 3203, 82 L.Ed.2d 393 (1984); *Parratt* v. *Taylor*, 451 U.S. 527, 541, 101 S. Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels* v. *Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L.Ed.2d 662 (1986). In the latter case, the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post-deprivation remedy. *Hudson* v. *Palmer*, 468 U.S. at 531, 533, 104 S. Ct. at 3202-03, 3203-04. When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process. *Id.* at 532, 104 S. Ct. at 3203; *Logan* v. *Zimmerman Brush Co.*, 455 U.S. 422, 435-36, 102 S. Ct. 1148, 1157-58, 71 L.Ed.2d 265 (1982).

101 F.3d at 880. The plaintiff in *HANAC* complained that the City's chief procurement officer had instructed all city agency heads to reject all of the plaintiff's proposals and to cancel all existing contracts with the plaintiff as they came up for renewal, resulting in a *de facto* debarment. *Id.* at 881. The Second Circuit observed that the plaintiff made no claim that the due process violation was caused by an established state procedure, such as the City Charter or Procurement Policy Board ("PPB") Rules. *Id.* "To the contrary, [the plaintiff] argue[d] that state officials acted in flagrant *violation* of the City Charter and PPB Rules." *Id.* (emphasis added).

29

Despite the *HANAC* plaintiff's allegation that the officials who denied it due process were high-ranking policymakers, the Court held that the deprivation was still random and arbitrary because it had not been done according to established state procedures.  101 F.3d at 881-82.  Accordingly, the Second Circuit stated that, following "*Parratt*, *Hudson* and their progeny, … there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state post-deprivation procedure to remedy a random, arbitrary deprivation of property or liberty."  *Id.* at 882 (emphasis in original).

A sister court in this District noted as much in *Carnell* v. *Myers*, No. 17 Civ. 7693 (KMK), 2019 WL 1171489 (S.D.N.Y. Mar. 13, 2019).  There, the court dismissed the plaintiff's procedural due process claim, in which he alleged that he had been coerced to surrender his paramedic license without a formal hearing.  *Id.* at *5-6.  In so doing, the court cited *Giglio*'s holding that the availability of an Article 78 proceeding satisfies procedural due process in a case where a New York State employee claims a coerced resignation.  *Id.* at *6. Further, citing *HANAC*, the court explained that in coercing the plaintiff to surrender his license, defendants had *violated* state procedures, rather than acted pursuant to such procedures, such that the alleged deprivation was thus a "random, unauthorized act" for which an Article 78 procedure sufficed.  *Id.* at *5.

As in *HANAC* and *Carnell*, Plaintiffs here allege that Commissioner Bratton and Deputy Commissioner Byrne violated New York State and City Law that entitled them to certain pre-deprivation process by prejudging the outcome

30

of their hearings.  Plaintiffs make no claim that their alleged due process
violation was caused by an established state procedure, such as the City
Charter.  Under *Giglio* and *HANAC*, they have failed to establish a due process
violation.

### c.  New York's Article 78 Procedure Provided Plaintiffs with Adequate Post-Deprivation Process

No one disputes that Plaintiffs, following their retirements, had the
opportunity to challenge the voluntariness of their respective decisions by
commencing an Article 78 proceeding.  Plaintiffs do not explain how the Article
78 proceeding, in which they could have challenged their allegedly coerced
resignations, would have provided insufficient due process.  Their failure to
avail themselves of such post-deprivation procedure does not render their due
process claims viable.  *See HANAC*, 101 F.3d at 881.  Plaintiffs are not entitled
to circumvent established due process protections and then claim they were
never afforded such protections.  *See Finley* v. *Giacobbe*, 79 F.3d 1285, 1296
(2d Cir. 1996) (concluding that plaintiff who resigns before employer takes all
the steps necessary to fire her cannot complain of procedural due process
violation, because "the resignation effectively deprives the employer of the
opportunity to comply with the procedural obligations").

Plaintiffs' argument that *Giglio* is no longer good law also fails.  The
Second Circuit relied on *Giglio* in *Stenson*, a 2000 decision, and thereafter has
continued to cite *Giglio* as good law.  *See, e.g., Hoover* v. *Cty. of Broome*, 340 F.
App'x 708, 711 (2d Cir. 2009) (summary order) ("Even assuming the evidence
could support the inference that Hoover suffered a constructive discharge, we

31

agree with the district court that Hoover would not be entitled to a pre-deprivation remedy for the constructive discharge.").  A plethora of district courts have as well.  *See, e.g.*, *Dodson,* 44 F. Supp. 3d at 248 ("[I]t is well-settled that where a New York state employee resigns and later contends that his resignation was not voluntary, the lack of a hearing prior to the resignation does not deprive the employee of procedural due process because New York has provided an opportunity for a post-deprivation hearing in the form of an Article 78 proceeding." (citing *Giglio*, 732 F.3d at 1135)); *Silverman*, 2001 WL 1776157, at *3 (noting that a pre-deprivation hearing "would make little sense" where plaintiff "was not terminated from his position, but rather resigned"); *Cole-Hatchard*, 2017 WL 4155409, at *7 (dismissing police officer's due process claim where he resigned); *Carnell*, 2019 WL 1171489, at *6 ("[D]istrict courts in this Circuit have subsequently applied *Giglio*'s holding that the availability of an Article 78 proceeding satisfies procedural due process in a case where a New York state employee claims a coerced resignation." (internal quotation marks omitted)); *Guttilla* v. *City of New York*, No. 14 Civ. 156 (JPO), 2015 WL 437405, at *8 (S.D.N.Y. Feb. 3, 2015) (citing *Giglio* in dismissing plaintiff's due process claim that she had been coerced into resigning from her tenured position with the New York City Department of Education because of the availability of an Article 78 proceeding); *Fotopolous* v. *Bd. of Fire Comm'rs of Hicksville Fire Dep't*, 11 F. Supp. 3d 348, 371 (E.D.N.Y. 2014) ("While a public employee with a property right in his job is normally entitled to a pre-termination hearing, it is impractical for employees who are constructively

32

discharged to obtain a pre-termination hearing, and the availability of an Article 78 proceeding subsequent to termination provides adequate procedural due process."); *McGann* v. *City of New York*, No. 12 Civ. 5746 (PAE), 2013 WL 1234928, at *8 (S.D.N.Y. Mar. 27, 2013) ("[E]ven assuming the dubious proposition that McGann was constructively discharged, he was not denied due process ... [because] had [he] wished to challenge his resignation as coerced, McGann could have instituted an Article 78 proceeding in New York state court."); *Kruggel* v. *Town of Arietta*, No. 6:11 Civ. 1250 (LEK) (ATB), 2013 WL 5304184, at *4 (N.D.N.Y. Sept. 19, 2013) (holding that availability of an Article 78 proceeding is all the process that is due "where, as here, a plaintiff claims that her resignation was coerced, because the voluntariness of a resignation cannot be determined in advance").  Plaintiffs have provided the Court with no compelling reason to depart from established Second Circuit law, and the Court sees no reason to do so.

For all of these reasons, Plaintiffs have failed to state a due process claim.  The Court thus need not reach the questions of whether the City can be held municipally liable, or whether either or both of Commissioner Bratton and Deputy Commissioner Byrne are entitled to qualified immunity.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is GRANTED.  Plaintiffs' Complaint is dismissed.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      May 27, 2020
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge